08-5266-cr(L), 09-0992-cr, 09-1076-cr
USA v. Persico

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2009

(Argued: June 14, 2010                    Decided: May 3, 2011)

Docket Nos. 08-5266-cr(L), 09-0992-cr, 09-1076-cr

_____

UNITED STATES OF AMERICA,

Appellee,

- v. -

ALPHONSE T. PERSICO, also known as Kid, also known as
Allie Boy, and JOHN J. DeROSS, also known as Jackie,

Defendants-Appellants.

_____

Before: JACOBS, Chief Judge, KEARSE and LEVAL, Circuit Judges.

Appeals from judgments of the United States District Court for the Eastern District of New York, Joanna Seybert, Judge, convicting defendants of murder in aid of racketeering, witness tampering, and conspiracy to commit witness tampering, 18 U.S.C. §§ 1959(a)(1), 1512(b)(1) & (b)(2)(A), and 371, and sentencing them to life imprisonment.

Affirmed.

JOHN DAVID BURETTA, JEFFREY GOLDBERG, Assistant United States Attorneys, Brooklyn, New York (Benton J. Campbell, United States Attorney for the Eastern District of New York, Peter A. Norling, Elizabeth Geddes, James Gatta, Assistant United States Attorneys, Brooklyn, New York, on the brief), for Appellee.

PAUL SHECHTMAN, New York, New York (Nathaniel Z. Marmur, Stillman, Friedman & Shechtman, New York, New York, on the brief), for Defendant-Appellant Persico.

ROBERT P. LaRUSSO, Mineola, New York (LaRusso & Conway, Mineola, New York, on the brief), for Defendant-Appellant DeRoss.

KEARSE, Circuit Judge:

Defendants Alphonse T. Persico ("Persico") and John J. DeRoss appeal from judgments entered in the United States District Court for the Eastern District of New York following a jury trial before Joanna Seybert, Judge, convicting them of the murder in May 1999 of William ("Bill," "Billy," or "Wild Bill") Cutolo Sr. ("Cutolo") in aid of racketeering, in violation of 18 U.S.C. § 1959(a)(1) (Count One), witness tampering, in violation of 18 U.S.C. §§ 1512(b)(1) and (b)(2)(A) (Count Six), and conspiracy to commit witness tampering, in violation of 18 U.S.C. § 371 (Count Five), and sentencing them principally to life imprisonment. On appeal, defendants contend, inter alia, that they should have been granted a new trial after the posttrial discovery of Cutolo's body; that there were prejudicial errors in the admission of certain testimony by Cutolo's widow; that the evidence was insufficient to support their convictions on the witness-tampering

- 2 -

counts; and that the government improperly withheld information that was material to the defense; DeRoss also contends that the admission of certain testimony by Cutolo's daughter was unduly prejudicial and that the evidence was insufficient to support his conviction on the murder count. Finding no basis for reversal, we affirm the judgments of conviction.

## I.  BACKGROUND

The present prosecution grew out of a struggle for power within the Colombo Crime Family (or "Colombo Family"), one of five organized crime families (collectively "La Cosa Nostra" or the "Mafia") in the New York City area. The indictment alleged that the Colombo Family constituted a RICO enterprise, see 18 U.S.C. § 1961(4), whose purposes included the enrichment of its members and associates through illegal activities and through the concealment of those activities, their participants, and the locations of their proceeds. It alleged that Persico, who was also known as "Kid," "Allie," or "Allie Boy," was at various times a soldier, a captain, and the acting boss--or leader--of the Colombo Family; and that DeRoss, who was also known as "Jackie," was at various times a soldier, a captain, and the acting underboss--or second in command--of that family. At the trial leading to defendants' convictions on the above charges--a prior trial had ended in a hung jury--the government's evidence included tape-recorded conversations, telephone records, and testimony by

numerous Federal Bureau of Investigation ("FBI") agents, Cutolo's wife and his daughter, and several former members or associates of organized crime. The evidence as to Cutolo's murder was circumstantial; there was no eyewitness testimony, and as of the time of trial his body had not been found.

The evidence at trial, taken in the light most favorable to the government, showed the following.

A. The Colombo Family War and the Ascensions of Persico and Cutolo

Each of the five organized crime families was typically run by a boss, assisted by an underboss and a consigliere, or advisor; below that administrative trio were the family's captains, or capos, who supervised the "soldiers," i.e., those who had been made "members" of the family by formal induction. The soldiers, in turn, managed participants in or contributors to family enterprises who were not "made members" and were called "associates." (Trial Transcript ("Tr.") 1139-42.) Crime family protocols were stringent. Members and associates of a family were not allowed to speak to members of other crime families or to higher-ranking members of their own family without a formal introduction. (See, e.g., Tr. 1414-16.) Members involved in disputes were expected to discuss matters civilly (have a "sit-down"), with at least the appearance of mutual respect. (See, e.g., id. at 1148, 1200-01, 1910.) And no family member-- especially no underboss, a member of the family's administration-- could be killed without permission from the boss. (See, e.g., id.

- 4 -

at 1275 (made member), 1827 (underboss), 1756 ("Nobody can kill the underboss without . . . exposing yourself to get killed yourself."); see also id. at 2994 (no "boss" could be killed without permission of the La Cosa Nostra ruling body, the "Commission").) Salvatore Vitale, a member of the Bonanno Crime Family (or "Bonanno Family") for some 30 years, testified that by the time he became that family's underboss he had been involved in 11 murders; in each instance he had the permission of the Bonanno Family's boss to commit the murder. (See, e.g., id. at 2863, 2874.) Michael DiLeonardo, a former captain in the Gambino Crime Family (or "Gambino Family"), testified that various Mafia rules were often broken, but the rule against killing a made member without permission was broken less frequently, as the punishment would be death. (See, e.g., id. at 1754-56; see also id. at 1744-49 (killing of the new Gambino Family underboss in 1986 was authorized by the Commission after the unauthorized killings in 1985 of Gambino boss Paul Castellano and his underboss).)

In the early 1990s, the boss of the Colombo Crime Family was Persico's father, Carmine Persico, who was serving a lengthy term of imprisonment. Persico and DeRoss, who were captains, were also in prison, but for much shorter terms. Victor Orena was the family's acting boss, a position to which Persico aspired. A bloody war was sparked when someone tried to kill Orena, motivated by the fact that Persico would soon be released from prison and the belief that Orena would refuse to step down as acting boss. (See, e.g., id. at 1271-76, 1732, 2881-85.) In the

intra-family war, there were about a dozen killings (see id. at 1278); Cutolo was a member of the faction supporting Orena (see id. at 1276). The war ended in 1992 or 1993 because so many family members had been killed or arrested; but there remained two factions, and the Commission would not allow the Colombo Family to induct new members until the family got itself in order. (See, e.g., id. at 1282, 1820, 2886-87.) DeRoss, Cutolo, and several others got together and decided to attempt a reconciliation, operating with Persico as their captain. (See id. at 1282-85.) In about 1998, the Commission decided to back the Persico faction (see id. at 2891-92); Persico became the family's acting boss, and Cutolo became the acting underboss (see, e.g., id. at 1421).

Cutolo, by all accounts, was difficult to deal with: intransigent in negotiations with other crime families and harsh with members and associates of his own crime family. (See, e.g., Tr. 1790-91, 1288-89, 2231-37, 2277-78, 2283-89.) DiLeonardo, as a captain in the Gambino Crime Family, served as that family's liaison with the Colombo Family. (See id. at 1729.) He was friendly with DeRoss, whose grandchildren played football on a team with DiLeonardo's son, and was even more friendly with Persico. (See id. at 2106-07, 1797-98.) DiLeonardo testified that, in his liaison capacity, he met with Cutolo dozens of times (see id. at 1732), and he viewed Cutolo as having aspirations to become the boss of the Colombo Family (see, e.g., id. at 1821 ("You could see him coming like a train"; he "had a lot of momentum behind him. He wasn't about to sit still. . . . He was

- 6 -

all about Cosa Nostra, and he wanted to wear the main hat, the main.")). DiLeonardo was concerned that Cutolo might kill Persico. (See, e.g., id. at 1822 (Cutolo "was a threat to Allie"; "he would have killed him. I know he would have killed Allie in time.").) DiLeonardo thus warned Persico, "Bill has boss mentality"; Persico understood what that meant. (Id.)

Joseph Campanella was a Colombo soldier who had grown up with Cutolo and socialized with Cutolo and Cutolo's three adult children. (See Tr. 1262-63.) When Campanella became a made member of the Colombo Family, Cutolo was his captain (see id. at 1275); during the Colombo Family war, Campanella was one of Cutolo's bodyguards (see id. at 1277); and during a 13-month period when Cutolo was in jail, Campanella ran Cutolo's crew of soldiers and associates (see id. at 1283); but once Cutolo became the Colombo underboss, Cutolo became "distant" (id. at 1288). There was also controversy over Campanella's owing Cutolo some $300,000, which Cutolo had advanced several years earlier for loansharking activity. (See id. at 1288, 1346.) In early 1999, Campanella bought himself a Mercedes automobile; DeRoss told Campanella that Cutolo was annoyed that Campanella would be spending substantial sums on himself, rather than repaying any of his debt to Cutolo, and that Cutolo was threatening to break the windows in Campanella's car. Campanella told DeRoss he was "very, very offended" by Cutolo's threat. (Id. at 1288-89.)

In mid-April 1999, Campanella and DeRoss were to attend an unrelated sit-down and were discussing what they would say.

- 7 -

Campanella testified that during their preparations for that meeting "Jack DeRoss asked me how I feel about killing Wild Bill," and "[h]e was serious." (Id. at 1291-92.) DeRoss never joked with Campanella about killing anyone. (See id. at 1629.) Campanella declined; he testified that he was upset with Cutolo but did not want to kill him. (See id. at 1292.)

Giovanni Floridia (aka "John the Barber") testified that he became associated with the Colombo Family in the mid-1990s when he began loansharking with money loaned to him by Tommy and Richie Cappa, who were Colombo associates. (See Tr. 2226-30.) Floridia had not yet met Cutolo, and he first incurred Cutolo's wrath in 1997 when he told one of his borrowers, as he had been instructed to do by Richie Cappa, that the borrowed money had come from Cutolo. (See id. at 2231-32.) Cutolo was enraged--apparently because his name was being used and he was not receiving payments--and threatened to split Floridia's head open if Floridia used Cutolo's name again. (See id. at 2232.) Thereafter, Cutolo summoned Floridia and asked how much money he had out "on the street"; although the amount was approximately $300,000, Floridia responded, again as directed by Richie Cappa, that the amount was $80,000-$100,000; Cutolo instructed Floridia to come to Cutolo's club on Wednesday nights, as did others working for Cutolo, and make payments directly. (Id. at 2233-35; 2294-95.) Thereafter, Floridia was "on record with" Cutolo (id. at 2296), i.e., officially a member of Cutolo's crew.

By the spring of 1999, Cutolo discovered that Floridia had lied about how much money he had loaned out. Cutolo summoned Floridia to a meeting and berated him. Cutolo essentially confiscated $50,000 that Floridia was expecting to receive from a robbery in which he had recently participated and "tax[ed]" him an additional $25,000 for having lied about how much money he had on the street. (Id. at 2280-84.) When Floridia failed to pay the $25,000, Cutolo had Floridia assaulted. (See id. at 2286-87.)

Floridia, furious, complained about Cutolo to his friend John Cerbone (aka "Johnny Brains" (Tr. 2238)), a Colombo associate, and to Colombo soldier Vincent ("Chickie") DeMartino (see id. at 2287-88). Cerbone had introduced Floridia to DeMartino and told him that DeMartino was "a killer in the family." (Id. at 2276.) Floridia testified that DeMartino, after hearing his complaints about Cutolo, said "Listen, don't worry about it. This guy is not going to be around much longer. I'm going to call Jackie"--i.e., DeRoss--"and I want you to tell him exactly what happened. And you're going to meet him and tell him exactly what happened." (Id. at 2288.) Floridia understood "[t]his guy," who was "not going to be around much longer," to mean Cutolo. (Id. at 2289.)

Thereafter, Cerbone told Floridia where and when to meet DeRoss. (See id. at 2289-90.) At that meeting, DeRoss told Floridia to continue with what he was doing and to "[s]tick with Chickie." (Id. at 2291.) DeRoss said, "Don't worry about it. Things are going to change." (Id.) Floridia's understanding of

- 9 -

DeRoss's statement--especially in light of DeMartino's earlier statement that Cutolo would not be around much longer--was "that they were going to whack Billy." (Id.) Floridia testified that DeRoss's demeanor was serious. (See id. at 2292.) Some two weeks later, on May 26, 1999, Cutolo disappeared. (See id.)

B. The Events and Aftermath of May 26, 1999

On May 25, Persico and Cutolo paged each other several times, and they later spoke by telephone. (See id. at 4223; Government Exhibit ("GX") 70C.) Betty Anne Fox, Cutolo's girlfriend of some 20 years (see Tr. 4588-89), testified that Cutolo was upset that night, telling her that he could not spend time with her the next day as planned because he had had to reschedule a planned appointment from the 25th to the 26th (see id. at 4571-72).

On Wednesday May 26, Cutolo went to the Manhattan office of the union of which he was an officer; Wednesday was his usual day there, but he remained a shorter time than usual. (See id. at 394, 3709-10.) Marguerite Cutolo ("Peggy Cutolo" or "Peggy"), Cutolo's wife of some 30 years (see id. at 553), paged Cutolo around midday, and testified, over defendants' objections, that when he called back he told her he had to go "to Brooklyn" to meet "The Kid," by whom she understood him to mean "Allie Boy Persico" (id. at 567). As discussed in greater detail in Part II.A.2. below, Peggy testified that Cutolo had told her he habitually met with Persico at 92nd Street and Shore Road (or

"92nd and Shore") in Brooklyn, near an overpass where they could avoid surveillance by the FBI (see id. at 567-68).

In the early afternoon of May 26, Cutolo proceeded to drive to Brooklyn; but because he was having problems with his car, he drove it to a repair shop. At his request, the mechanic accompanied Cutolo to 92nd Street and Shore Road and left him there at about 3:15, taking the car back to the shop to be repaired. (See id. at 214-18.) Cutolo said he would come for his car around 5:30; he did not. (See id. at 215, 223.) Cutolo's family and friends never saw or heard from him again.

On Wednesday nights, Cutolo normally went to his club, where members of his crew would assemble and spend the evening. If he could not be there, he normally called to let them know. (See Tr. 1431.) On the evening of Wednesday May 26, his crew became concerned when Cutolo neither came nor called. Cutolo's son, William Cutolo Jr. ("Cutolo Jr."), tried unsuccessfully to reach him by telephone. (See id. at 1432.) Cutolo Jr. called his mother, who became anxious (see id. at 568-69); she had tried to reach Cutolo by telephone that afternoon, without success (see id. at 293-94). Peggy Cutolo continued to try to call or page her husband all the following day. (See, e.g., id. at 294-95, 569, 800-01.)

Early on the morning of May 27, Cutolo Jr., "practically crying" (id. at 594), went to his parents' house and told his mother, "nobody knows where daddy is. Nobody, nobody heard from him. Nobody even beeped him. He never got called--nobody called,

- 11 -

he--he wasn't there" (id. at 569). Campanella and other members of Cutolo's crew arrived at Cutolo's home in the late morning of May 27. (See id. at 1294-95.) Peggy Cutolo was distraught; Campanella himself was devastated because he knew "Bill ain't never coming home" (id. at 1295; see id. at 372, 595 (Campanella was "in tears," "crying like a baby")).

DeRoss, according to Peggy Cutolo, had arrived at the Cutolo home on May 27 at 5 or 6 a.m.--barely eight hours after Cutolo could be considered missing. (See Tr. 794, 570.) DeRoss demanded "the records and the papers," which Peggy understood to refer to the Colombo Family "books of all the money that was out" in loansharked loans. (Id. at 569-70.) She testified, "There wasn't a tear in his eye. . . . I knew at that point that my husband was dead." (Id. at 570.)

DeRoss went to Cutolo's house again a day or two later, and returned every few days thereafter (see id. at 595-96, 598), insisting that there must be books and records. Barbara Jean Cardinale, Cutolo's daughter, who had moved, with her husband and two young daughters, into her parents' home in order to take care of her mother after her father's disappearance (see id. at 323), testified that DeRoss's tone in demanding the records implied that "he was entitled to them" (id. at 300). DeRoss searched Cutolo's office, the bedrooms, and the attic, going through drawers, cabinets, and bookshelves, looking behind and under furniture, and knocking on walls to locate secret panels. (See id. at 300-01, 598-99.) Peggy Cutolo knew there were records, as well as money--

- 12 -

$1.65 million, as it turned out, see Part II.D.1. below--hidden in a vent above the stove and in tubing in the attic, but she repeatedly stonewalled DeRoss. (See, e.g., id. at 596, 649-50.)

In none of his conversations with the Cutolos after May 26 did DeRoss mention any effort to locate Cutolo. (See id. at 301.) On one occasion, DeRoss suggested that Cutolo might have gone "on the lam"; but Peggy Cutolo knew that if Cutolo had simply absconded or gone into hiding, he would have "taken what was there," and he had taken nothing. (Id. at 597-98.)

Cardinale testified, over objection, that it was her belief--which she communicated to others (see id. at 305-07, 423-26)--that Vincent DeMartino had "carried out the order to kill [her] father" (id. at 307). When word of her statements reached DeRoss, he summoned her to meet with him and said "that I shouldn't be talking like that. I have kids here and to think about everybody else before I talk like that." (Id. at 308.) In addition, as discussed in greater detail in Parts II.A.3. and B.2. below, DeRoss thereafter--in a recorded conversation--warned Cardinale, Cutolo Jr., and Peggy Cutolo against making statements about what they believed had happened to Cutolo, especially statements to "the law" (GX 67B at 6). DeRoss told them, inter alia, "Worry about your family" (id. at 8); "You got little, you got kids here" (id. at 5). "You understand what I'm telling you babe? You've been, you've been around this life." (Id. at 6.) Cardinale, who had known since the age of 14 that her father was connected to organized crime and had overheard many of Cutolo's

organized-crime-related conversations (see Tr. 286, 288-89), testified that she understood DeRoss to be threatening the safety of her family (see id. at 324-28, 328-31).

C.   Evidence that Cutolo Was Dead

Because Cutolo's body had not been found at the time of trial, the defendants argued that "there is no evidence that Billy Cutolo's dead" (Tr. 111).   To show that Persico and DeRoss knew that Cutolo was in fact dead, and not merely on the lam, the government introduced, inter alia, evidence that a crime family would normally conduct an investigation into the death or unexplained disappearance of a family member--and especially of a boss or underboss (see id. at 1747-48, 2894-95)--and that there was no semblance of any investigation by the Colombo Family into the disappearance of Cutolo.   Vitale, who in 1999 was the Bonanno Family underboss, testified that no one from the Colombo Family ever made inquiry of him or told him they were investigating Cutolo's disappearance (see id. at 2894); and DiLeonardo, the liaison from the Gambino Family, testified that he never heard that the Colombo leaders were undertaking any such investigation (see id. at 1828).   Instead, DeRoss, a captain, had promptly gone to his superior's house and demanded the crime family's books and records.   DeRoss had also proceeded to summon the members of Cutolo's crew and interrogate them as to the current state of family business (see, e.g., id. at 1295-99)--a normal crime family practice when a family member is known to have died (see id.

- 14 -

at 2118-20). And DeRoss was shortly introduced as the new underboss. (See, e.g., id. at 2107-08.)

In addition, the government presented evidence of statements made by Persico and DeRoss to Colombo members or associates, and to members of other crime families, indicating that Persico and DeRoss had ordered and arranged Cutolo's death. It also introduced a document found in Persico's apartment in October 1999, which bore the notation that $50,000 was paid to DeMartino one month after Cutolo's disappearance (see Tr. 3469; GX 59), and evidence of statements about Cutolo's disappearance made by DeMartino, who the government contended had been involved in carrying out the order to kill Cutolo. There was testimony as to several such statements.

About a week after Cutolo disappeared, DiLeonardo was to have had a meeting with him; when DiLeonardo arrived for the scheduled meeting, however, only Persico and DeRoss were there. (See Tr. 1823-24.) When DiLeonardo asked where Cutolo was, DeRoss, with Persico standing behind him, said, "[Haven't you] heard, he [has been] missing for a week. . . . [Y]ou will be dealing with us now and everything will be eas[ier]." (Id. at 1824-25.) Both Persico and DeRoss seemed undisturbed, and DiLeonardo understood DeRoss to be telling him that Cutolo was dead. (See id. at 1825-26.)

Some two weeks after Cutolo's disappearance, Campanella went to DeRoss's home to discuss DeRoss's treatment of a member of Campanella's crew. In the course of their conversation,

Campanella asked DeRoss what else was going on. Campanella testified that DeRoss "said Billy is gone" (id. at 1474); "Jackie just told me the situation with Wild Bill, that Bill had to go, he was getting too powerful. If . . . Allie Boy went away on a gun charge, Bill would have took over the family" (id. at 1299). It was known that Persico had been arrested a few months earlier on gun possession charges and that he would be sent back to prison within a year. (See, e.g., id. at 1476-77, 2029, 3668-69, 3921.) Campanella testified that DeRoss said Cutolo "would have never gave the family back to Allie Boy. And that Bill had to go. He was too powerful." (Id. at 1299.)

A week after that, Campanella had a meeting with both DeRoss and Persico. DeRoss, with Persico sitting beside him, told Campanella, "we'll lie no more. Bill is gone. And he says it would be family business as usual." (Id. at 1301-02.) Despite the reference to business as usual, and despite the fact loansharked money was normally viewed as belonging to the crime family (see, e.g., id. at 1969-70), Campanella's $300,000 debt to Cutolo was canceled: Campanella testified, DeRoss "told me that the money that I owed Bill was to be squashed, and not to pay it back" (id.).

In the latter part of 1999, Vitale, as the Bonanno Family's underboss, and Joseph Massino, its boss, met with Persico at Persico's request. (See Tr. 2865, 2895-2900.) At that meeting, Persico spoke of Cutolo and said, "he can't take what's not his." (Id. at 2867.) It would have been protocol, if Cutolo

had been alive, for him as underboss to attend the meeting; when Persico said "he can't take what's not his," Vitale "believed Wild Bill was dead." (Id. at 2869; see id. at 2866.) Vitale testified, "we would never say 'I killed that individual' or 'I chopped him up.' We would use a gesture or a motion or we knew what he was talking about." (Id. at 2900.)

Floridia, who had been told some two weeks before Cutolo's disappearance that Cutolo would soon be gone, received word that Cutolo was dead from several Colombo members or associates. First, Floridia testified that on the morning after Cutolo's disappearance, Cerbone "told me, Listen, Billy's gone." (Id. at 2295.) When Floridia asked what he meant, Cerbone said, "He's gone, that's it. If anybody comes around, don't talk to nobody. Don't give them all the answers. We'll get in touch with you." (Id. at 2296.) Floridia testified that at that point "I know they killed Billy." (Id.)

Floridia thereafter was "on record with" DeMartino rather than Cutolo. (Tr. 2296.) DeMartino, with whom Floridia became quite friendly and spent most of his days (see id. at 2298-99)-- until DeMartino threatened to kill him (see id. at 2309)-- repeatedly made statements to Floridia about Cutolo's disappearance. DeMartino had once been a good friend of Cutolo (see id. at 305) but had gone to prison; when he was released in or around 1997, Cutolo banned him from Cutolo's club, ostensibly because DeMartino could be observed associating with known criminals and thus violating the terms of his supervised release

- 17 -

(see id. at 2276-77); Cutolo also told everyone in the family to stay away from DeMartino (see id. at 2277). DeMartino was angered because of that treatment--and because Cutolo did not allow him to earn money as part of Cutolo's crew and instead told him to get a real job. (See id. at 305, 2277, 2297.) DeMartino told Floridia that "the reason why Billy is not around is because, you know, he didn't know how to treat his guys. He robbed them. He got them playing against each other. And that's why he's gone." (Id. at 2297.) DeMartino said "he deserved" what he got, and "[t]hey're never going to find him." (Id.) Floridia understood "he" and "him" to refer to Cutolo. (Id. at 2297-98.)

Finally, in 2004, when Floridia was in the Metropolitan Detention Center in Brooklyn in connection with charges that he and DeMartino had attempted to kill Campanella in 2001, Floridia spent much of his time with DeRoss, who was then the only other Colombo member or associate incarcerated at that facility. (See id. at 2351-53.) DeRoss had originally been Cutolo's captain (see id. at 2355-56); he had proposed Cutolo for membership in the Colombo Family (see id. at 559). DeRoss had then gone to prison for some eight years; when he was released he thought the relationship between himself and Cutolo should be the same, and he had resented being Cutolo's subordinate. (See id. at 559-61, 2356-57.) Floridia testified that, in their prison chats, DeRoss "would tell me he brought Billy into the family. . . . [A]nd he took him out of the family." (Id. at 2356-57.) Floridia

understood that by "took [Cutolo] out," DeRoss meant "he killed him." (Id. at 2357; see, e.g., id. at 2224.)

The government suggested that DeMartino's statements to Floridia that "[t]hey're never going to find" Cutolo adverted to a disposal of Cutolo's body at sea. On May 26, Cutolo had been dropped off at 92nd Street and Shore Road at 3:15 p.m. Telephone records were introduced showing that 20 minutes later Persico received a call from a pay telephone near DeMartino's place of business (see Tr. 4221, 4224-25), and that less than an hour after that, Persico placed a call to a local marina that kept no records as to boats' comings and goings (see id. at 4220, 5374). In its main and rebuttal summations, the government argued that that marina would be a "[p]retty good place for Persico's minions to take a dead body," to "take it out to sea" (id. at 5561; see id. at 5947 ("the perfect place to take Cutolo's dead body"); id. at 5949 ("It's not a coincidence that while Cutolo is in the process of being taken to be murdered, Persico's checking on the marina.")).

D.    The Verdict and the Posttrial Motions

The jury found Persico and DeRoss guilty on the three counts indicated above, i.e., murder of Cutolo in aid of racketeering, witness tampering with respect to Peggy Cutolo, Cutolo Jr., and Cardinale (collectively "the Cutolos"), and conspiracy to tamper with the testimony of the Cutolos. Persico and DeRoss had also been charged in the indictment with one count

- 19 -

of conspiring to murder Campanella in 2001 and with two counts of firearms violations in connection with the attempt on Campanella's life. The jury acquitted Persico and DeRoss on the latter three charges.

After the jury returned its verdicts, Persico and DeRoss moved pursuant to Fed. R. Crim. P. 29(c) for judgments of acquittal, contending that the government had failed to present sufficient evidence as to one or more elements of each of the counts on which they were convicted. As to the murder count, they argued that there was insufficient evidence to prove (a) that Cutolo was in fact dead, (b) that Cutolo died as a result of murder, or (c) if Cutolo was murdered, that Persico or DeRoss murdered him or commanded, procured, or caused his murder. As to the witness tampering counts, they argued that the evidence was insufficient to show any intent to influence or interfere with any potential testimony of any member of the Cutolo family in an official proceeding.

In addition, Persico and DeRoss moved pursuant to Fed. R. Crim. P. 33 for a new trial on various grounds. In their original motion, pointing to testimony by Peggy Cutolo that she had informed the government of finding the $1.65 million in cash stashed away by Cutolo and had been allowed to keep the money, defendants contended principally that either that testimony was perjurious and the government had violated its obligations under Giglio v. United States, 405 U.S. 150 (1972), or the government had violated its obligations under Giglio and Brady v. Maryland,

373 U.S. 83 (1963), by failing to disclose to the defense that Peggy had been allowed to keep that money. In response, the government submitted the affidavit of a former Assistant United States Attorney ("AUSA"), subsequently supported by documentation, stating that the AUSA became aware in late 2000 or early 2001 that Peggy had told the FBI that she was in possession of a large amount of cash found in the Cutolo home after Cutolo disappeared, and that later in 2001 the government decided not to seek forfeiture of, or taxes on, that money.

Before the district court had ruled on either set of motions, Cutolo's body was found, buried in Farmingdale, New York. The government informed the court of the discovery and reported that the local medical examiner had "identified the cause of death as homicide." (Letter from AUSA John Buretta et al. to Judge Seybert dated October 7, 2008.) Persico and DeRoss immediately augmented their new-trial motions, arguing that "this new evidence directly contradicts the theory on which the government proceeded at trial," to wit, that "Persico had Cutolo's body put on a boat and taken out to sea and that Mr. Persico made a telephone call to a marina on the date of Cutolo's disappearance to arrange such disposal." (Letter from Sarita Kedia [counsel for Persico] and Robert LaRusso [counsel for DeRoss] to Judge Seybert dated October 7, 2008, at 1 (emphasis omitted).)

In a Memorandum and Order dated November 24, 2008 ("District Court 2008 Order"), the district court denied both sets of motions. With respect to the motions for acquittal, the court

concluded that the evidence was sufficient, largely citing evidence described above and in Parts II.B. and C. below. See District Court 2008 Order at 5-10, 13-17.

The district court also denied defendants' new-trial motions. It reasoned that although the discovery of Cutolo's body contradicted the government's theory as to the disposal of Cutolo's body, "the whereabouts of Cutolo, Sr.'s body [wa]s immaterial," id. at 25. The court pointed out that

> Defendants' convictions were not based on the theory that Persico or DeRoss pulled the trigger or that either Defendant was even present at Cutolo's murder. The newly discovered evidence regarding the burial location does not, therefore, contradict the Government's theory of the actual murder. The Government presented more than sufficient evidence to establish that the Defendants ordered Cutolo, Sr.'s death.

Id.

Finally, the district court concluded that Persico and DeRoss were not entitled to a new trial on the theory that Peggy Cutolo had committed perjury or that the government had violated its Brady obligation. It saw no basis for a finding of perjury, given the former AUSA's affidavit indicating that Peggy's testimony--that she had disclosed to the government, and had been allowed to keep, the $1.65 million--was true. See id. at 29-32. The court rejected the Brady branch of the motion principally on the grounds (a) that although the government should have disclosed those facts earlier, "there was no suppression" given that the information was disclosed on the fourth day of an eight-week trial, id. at 37, affording defendants ample time to use the

information, and (b) that defendants could not show prejudice, as "there was virtually no probability that disclosure of this information at an earlier time would have changed the outcome of this case," id. at 40.

II.  DISCUSSION

On appeal, Persico and DeRoss contend principally (a) that the district court erred in allowing Peggy Cutolo to testify that Cutolo had told her he routinely met with Persico at 92nd Street and Shore Road; (b) that the evidence was insufficient to support their convictions on the witness-tampering counts; (c) that they should have been granted a new trial following the discovery of Cutolo's body, which contradicted the government's theory that his body had been disposed of at sea; and (d) that the government's failure to disclose sooner that Peggy Cutolo had been allowed to keep Cutolo's $1.65 million stash violated its Brady obligation. Persico also contends that it was error to allow Peggy Cutolo to testify that Cutolo said he was going to meet Persico on May 26; DeRoss contends that the evidence was insufficient to support his conviction on the murder count and that it was error to allow Cardinale to testify about suspecting that DeMartino had carried out the order to kill her father; and both defendants contend that they were denied the constitutional right to compulsory process. We find all of defendants' arguments unpersuasive.

## A. The Evidentiary Challenges

At trial, Peggy Cutolo was allowed to testify with respect to conversations with Cutolo, in part, as follows:

Q. When your husband left your home on May 26, 1999, was that the last time that you saw your husband?

A. It was the last time I saw my husband.

. . . .

Q. Did there come a time later that day that you spoke with him on the telephone?

A. Yes.

Q. Approximately what time was that?

A. About 12 o'clock.

. . . .

Q. And when you spoke with your husband on the telephone, what was his mood?

A. Very abrupt and fast. He says my appointment was canceled. I have to run back to Brooklyn.

Q. And did he tell you who he was going to meet?

A. The Kid.

Q. And when your husband told you on May 26, 1999 that he was going to meet The Kid, who did you understand him to mean?

A. Allie Boy Persico.

Q. To your knowledge was there a particular location that your husband would meet Alphonse Persico?

A. 92nd Street and Shore Road.

Q. How do you know that?

A. My husband told me.

- 24 -

Q. What, if anything, did your husband describe to you about why he would meet Alphonse Persico at 92nd Street and Shore Road?

A. So they wouldn't be seen, because he had to go down like a couple of steps or stones, I don't know, and there is an overpass where you can talk where they wouldn't be seen.

Q. And when your husband told you that you couldn't be seen from that spot, what did you understand him to mean?

A. From the FBI.

(Tr. 566-68 (emphases added).) Peggy testified that Cutolo had told her many times that he met with Persico at 92nd and Shore; that location, so far as she knew, was their habitual meeting place. (See id. at 1057-60.)

Over defendants' objections, the district court allowed this testimony on the grounds that Cutolo's statement that he was going to Brooklyn to meet with Persico was admissible under Fed. R. Evid. 803(3) as a statement of Cutolo's intent, and that statements by Cutolo that he habitually met with Persico at 92nd Street and Shore Road were admissible either as hearsay falling within the exception for statements against penal interest, as provided by Fed. R. Evid. 804(b)(3), or as nonhearsay statements in furtherance of a conspiracy, within the scope of Fed. R. Evid. 801(d)(2)(E). The trial court's decision to admit evidence is reviewed for abuse of discretion. See, e.g., United States v. Quinones, 511 F.3d 289, 307, 311-12 (2d Cir. 2007) (Rule 803(3)), cert. denied, 129 S. Ct. 252 (2008); United States v. Williams, 506 F.3d 151, 155 (2d Cir. 2007) (Rule 804(b)(3)), cert. denied, 552 U.S. 1223 (2008).

1. **Peggy Cutolo's Testimony that Cutolo Said He Had To Go to Brooklyn To Meet The Kid**

Rule 803 of the Federal Rules of Evidence provides in pertinent part that

> [a] statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will

is "not excluded by the hearsay rule." Fed. R. Evid. 803(3) (emphases added). This exception reflects the decision of the Supreme Court in Mutual Life Insurance Co. v. Hillmon, 145 U.S. 285, 299-300 (1892) ("Hillmon"), which ruled admissible the evidence that a missing person had stated his intention to go on a trip with Hillmon because such a statement is

> evidence that, shortly before the time when other evidence tended to show that he went away, he had the intention of going, and of going with Hillmon, which made it more probable both that he did go and that he went with Hillmon than if there had been no proof of such intention.

Hillmon, 145 U.S. at 296. Thus, "[i]f relevant," a declarant's statement of his intent "may be introduced to prove that the declarant thereafter acted in accordance with the stated intent." United States v. Best, 219 F.3d 192, 198 (2d Cir. 2000), cert. denied, 532 U.S. 1007 (2001). The Advisory Committee Notes on the adoption of Rule 803(3), however, state that "the Committee intends that the Rule be construed to limit the doctrine of . . . Hillmon . . . so as to render statements of intent by a declarant

admissible only to prove his future conduct, not the future conduct of another person." Fed. R. Evid. 803 Advisory Committee Note (1974) (emphases added).

Persico relies on this limitation and on this Court's decision in United States v. Delvecchio, 816 F.2d 859 (2d Cir. 1987) ("Delvecchio"), to argue that Cutolo's statement could not properly be admitted against Persico "[a]bsent independent evidence that Persico met Cutolo at the Shore Road location" (Persico brief on appeal at 40 (emphasis added); see id. at 37, 38). His reliance is misplaced.

In Delvecchio, an agent testified that an informant had told him the informant intended to meet with Delvecchio on a certain date. When a meeting took place on that date, however, the surveilling law enforcement agent could not determine whether the person meeting with the informant was in fact Delvecchio. We ruled that the statement of the informant, the declarant, that he intended to meet with Delvecchio was not admissible to show that Delvecchio in fact met with him because there was no "independent evidence" that Delvecchio did so. 816 F.2d at 863.

Our holding in Delvecchio does not support Persico's argument. In that case--unlike the present case--the declarant's statement was offered "to prove [the nondeclarant's] attendance" at the meeting. Id. at 862 (emphases added). The point we made in Delvecchio was that, while a declarant's statement of intention to do something with another person is admissible as evidence that the declarant acted in accordance with his stated

- 27 -

intention, it is not admissible under Rule 803(3) to show that the third person also acted in accordance with an intention attributed to him by the declarant. In contrast, Cutolo's statement in the present case was in no way offered to show that in fact "Persico met Cutolo at the Shore Road location" (Persico brief on appeal at 40); rather, that statement was properly admitted to show Cutolo's intent to meet Persico there and to support an inference that Cutolo acted in furtherance of that intent, from which the jury could reasonably infer that Cutolo had communicated to Persico that Cutolo would be at Shore Road expecting to meet Persico there.

Cutolo's statement that he was going to Brooklyn on the afternoon of May 26 to meet with Persico made it more probable that Cutolo went to Brooklyn with the expectation of meeting there with Persico, than if he had made no such statement. Under 803(3), the jury could draw the inference that Cutolo acted in furtherance of his stated intent to go meet Persico. From this evidence and other evidence that Persico and Cutolo habitually conducted their meetings under the Shore Road overpass where they would not be observed, see Part II.A.2. below--together with the evidence that Cutolo went to that place that very afternoon--the jury could have inferred that Cutolo communicated to Persico (or to Persico's people) that Cutolo would be there expecting to meet Persico.

Such an inference would fit with the theory advanced by the government that Persico, engaging in a Mafia practice of

- 28 -

"luring" persons who were to be killed, had lured Cutolo to 92nd and Shore so that Persico could arrange for his murder. John Carillo, an investigator for the United States Attorney's Office for the Southern District of New York, explained that the La Cosa Nostra common practice of "luring" was meant "to make somebody comfortable. You don't want them to know that they are going to be killed, you want to make them as comfortable as possible so that they don't see it coming" (Tr. 1146). Vitale, the former Bonanno Family underboss, gave examples. He testified that

> [t]here was a situation in May of '81 where three captains were trying to take the family and Mr. Rastelli [former boss of the Bonanno Family] and Mr. Massino decided to kill the three captains so they fabricated saying there was going to be an administration meeting. When there is an administration meeting, all the captains must attend.
>
> When they walked in, they were shot to death, all three of them.

(Id. at 2875; see id. at 2871.) Vitale also described how two members of the Bonanno Family were killed for having allowed "Donnie Brasco," an undercover FBI agent, to infiltrate the family. One member was "lured to his death" by the boss and the consigliere, who summoned him by stating that they wanted an explanation; the other member was killed by his own cousins, who were used "to lure him in," giving him a "false sense of hope." (Id. at 2877.) Vitale testified that all 11 of the murders in which he had participated had involved "luring the victim[s] to their death, lying to them about where they were going." (Tr. 2874.)

The jury could infer that the reason DeRoss had asked Campanella whether he would be willing to participate in killing Cutolo was that Campanella, despite his $300,000 dispute with Cutolo, was still friendly with Cutolo and his children, and Cutolo would be off guard while Campanella lured him to his death. The jury could also infer that after Campanella declined, Persico decided simply to summon Cutolo to 92nd and Shore for an ostensibly routine meeting on the afternoon of May 26. (See, e.g., Persico brief on appeal at 39 (acknowledging that the government's theory was that Cutolo was "lured" to 92nd and Shore).) Persico himself did not need to be there to ensure Cutolo's arrival at or disappearance from that location.

Finally, there was considerable other evidence that Persico had solicited Cutolo's attendance under the Shore Road overpass on May 26. First, the telephone records showed that, after many attempts to connect with each other, Cutolo and Persico had spoken for about two minutes on the telephone on May 25. Second, that night, Cutolo told Fox he could not spend May 26 with her as planned because he had had to schedule an appointment for the 26th, a matter about which he was unhappy; it could be inferred that the only person who could force an unwanted schedule change on Cutolo, the family's obdurate underboss, was Persico, the boss. Third, on the afternoon of May 26, Cutolo in fact went to 92nd Street and Shore Road in Brooklyn, obviously planning to meet someone; he was dropped off there at 3:15 and said he would pick up his car from the repair shop at 5:30. Finally, Peggy

Cutolo permissibly testified, as discussed in Part II.A.2. below, that 92nd and Shore was the habitual meeting place for Cutolo and Persico.

In sum, under Rule 803(3), Cutolo's statement of his own intent to go to Brooklyn to meet Persico was not excluded by the hearsay rule. We see no abuse of the trial court's discretion in admitting Cutolo's statement expressing his own intention to go to Brooklyn to meet "The Kid."

2. Cutolo's Statements that He Routinely Met Persico at 92nd Street and Shore Road

Rule 804 of the Federal Rules of Evidence, as it read at the time of the trial in this case, provided, in pertinent part, that "if the declarant is unavailable as a witness,"

> [a] statement which . . . at the time of its making . . . so far tended to subject the declarant to civil or criminal liability . . . that a reasonable person in the declarant's position would not have made the statement unless believing it to be true

is "not excluded by the hearsay rule." Fed. R. Evid. 804(b)(3) (1974). "A statement will satisfy Rule 804(b)(3)'s requirement that it 'tended' to subject the declarant to criminal liability if it would be probative in a trial against the declarant." United States v. Garris, 616 F.2d 626, 630 (2d Cir.), cert. denied, 447 U.S. 926 (1980). "The Rule does not require that the declarant be aware that the incriminating statement subjects him to immediate criminal prosecution." United States v. Lang, 589 F.2d 92, 97 (2d Cir. 1978). Nor does the fact that the statement was made to the declarant's spouse provide a basis for ruling that it is not

- 31 -

within this hearsay exception. See, e.g., United States v. Katsougrakis, 715 F.2d 769, 777-78 (2d Cir. 1983), cert. denied, 464 U.S. 1040 (1984).

The statements by Cutolo that he routinely met with Persico at 92nd and Shore, and that they met at that spot because it enabled them to evade surveillance by the FBI, fit within this exception. While those statements would not have been sufficient, standing alone, to convict Cutolo of any crime, they would have been probative in a criminal trial against Cutolo to show his membership in the Colombo Crime Family and to support an inference that criminal messages were passed when he and Persico met at that spot. We see no abuse of discretion in the district court's ruling that, on this basis, Peggy Cutolo's testimony that Cutolo had told her many times that he met Persico at 92nd and Shore was not excluded by the hearsay rule. Accordingly, we need not address the court's alternative ruling that the statements were nonhearsay as statements in furtherance of a conspiracy.

3. The Testimony of Cardinale

Cardinale was allowed to testify at trial that, after Cutolo's disappearance, she told Colombo associate Michael Spataro and others that she believed DeMartino had carried out the order to kill her father. DeRoss argued that this testimony should be excluded both on the ground that it was based solely on hearsay statements by Cardinale herself and on the ground that it would be unduly prejudicial, see Fed. R. Evid. 802, 403. On appeal, he

pursues his Rule 403 objection, arguing that the government used Cardinale's belief to argue, in summation, that DeMartino had in fact carried out orders by Persico and DeRoss to kill Cutolo. We see no error in the admission of this testimony.

Defendants were charged not only with murder in aid of racketeering, but also with tampering with, and conspiring to tamper with, the testimony of Cardinale, Peggy Cutolo, and Cutolo Jr. The government sought to prove that word of Cardinale's belief reached DeRoss, and that that was part of the impetus for DeRoss's threatening to harm Cardinale's family if she or Peggy or Cutolo Jr. made such statements to law enforcement officials, see Part II.B.2. below. The district court allowed the testimony on the ground that Cardinale's testimony as to her statements was nonhearsay under Fed. R. Evid. 801, as it was offered simply for "the fact that she made these accusations" and was admissible because "[t]he rest of the testimony doesn't make any particular sense unless you have the chronology [of] how it occurred that Mr. DeRoss became aware of it" (Tr. 280; see id. at 281). The court concluded that the probative value of the evidence outweighed its potential for unfair prejudice.

After Cardinale testified that she had told Spataro she thought DeMartino carried out the order to kill her father, the district court gave the jury a limiting instruction. The court instructed that "[t]his evidence may not be considered as truth of the matter asserted. It is being used solely as background evidence, background information," and that the evidence, "at

th[at] point in time," was being "admi[tted] only . . . against . . . DeRoss, and not Alphonse Persico. The statement can be considered against Alphonse Persico if and when the government establishes that a conspiracy existed." (Id. at 307.)

We see no error in the court's ruling or its handling of this evidence.

Nor are we persuaded that undue prejudice was created thereafter through arguments by the government "explain[ing] for the first time during summations" (DeRoss brief on appeal at 57) the theory that DeMartino had actually performed the killing. There was an evidentiary basis for such a theory, even if it later turned out--as learned after trial--that DeMartino was involved only in the planning of the murder and did not himself pull the trigger. There was evidence, discussed in Parts I.A. and C. above, that DeMartino harbored a grudge against Cutolo. And there was testimony from Floridia that DeMartino was inordinately happy that Cutolo was gone, stating that Cutolo had gotten what "he deserved" (Tr. 2297); documentary evidence that a month after Cutolo was murdered Persico paid DeMartino $50,000 (see GX 59); and evidence that while DeMartino "from the beginning" had been feared, "it was even more so" after Cutolo's disappearance (Tr. 2299). In any event, what was important for the charges against Persico and DeRoss was proof that they had ordered and arranged the murder, not the identification of precisely which of the Colombo family members had carried out their instructions. And,

as shown in Parts I.A., B., and C. above and discussed in Parts II.B.1. and II.C. below, evidence as to the former was abundant.

B.    The Sufficiency Challenges

On appeal, defendants pursue arguments made in their Rule 29 motions for acquittal in the district court. DeRoss contends that the evidence was insufficient to support his conviction of murder in aid of racketeering. Both Persico and DeRoss contend that the evidence was insufficient to support their convictions on the two witness tampering counts. We find no merit in any of their contentions.

Under Rule 29, "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." Fed. R. Crim. P. 29(a). The test for sufficiency is whether, as to a given count, a "rational trier of fact could have found the defendant guilty beyond a reasonable doubt." United States v. Jackson, 335 F.3d 170, 180 (2d Cir. 2003) ("Jackson"). The district court

> must make that determination with the evidence against a particular defendant viewed in a light that is most favorable to the government, and with all reasonable inferences resolved in favor of the government. The jury may reach its verdict based upon inferences drawn from circumstantial evidence, and the evidence must be viewed in conjunction, not in isolation.

United States v. Eppolito, 543 F.3d 25, 45 (2d Cir. 2008) ("Eppolito") (internal quotation marks, brackets, and ellipses omitted), cert. denied, 129 S. Ct. 1027 (2009).

"Our mandate on appeal reflects the same standard, as we review the grant or denial of a judgment of acquittal under Rule 29 de novo," id., considering the evidence as a whole rather than piecemeal, see, e.g., id.; United States v. Guadagna, 183 F.3d 122, 130 (2d Cir. 1999), and viewing the evidence in the light most favorable to the government, see, e.g., Eppolito, 543 F.3d at 45; United States v. Pizzonia, 577 F.3d 455, 462 (2d Cir. 2009), cert. denied, 130 S. Ct. 1088 (2010).

> Viewing the evidence in the light most favorable to the government means "'crediting every inference that the jury might have drawn in favor of the government,'" United States v. Temple, 447 F.3d at 136-37 (quoting United States v. Walker, 191 F.3d 326, 333 (2d Cir.1999)), and recognizing that the government's evidence need not exclude every other possible hypothesis, see, e.g., United States v. Espaillet, 380 F.3d [713,] 718 [(2d Cir. 2004)]; United States v. Martinez, 54 F.3d 1040, 1043 (2d Cir.), cert. denied, 516 U.S. 1001 (1995); United States v. Ragosta, 970 F.2d 1085, 1090 (2d Cir.), cert. denied, 506 U.S. 1002 (1992). As "it is the task of the jury, not the court, to choose among competing inferences that can be drawn from the evidence," United States v. Jackson, 335 F.3d at 180, when there are such competing inferences, we must defer "to the jury's choice," United States v. Morrison, 153 F.3d 34, 49 (2d Cir.1998).

Eppolito, 543 F.3d at 45. Where there are conflicts in the testimony, we must defer to the jury's resolution of the weight of the evidence and the credibility of the witnesses. See, e.g., United States v. Coté, 544 F.3d 88, 99 (2d Cir. 2008) ("[t]he court must give full play to the right of the jury to determine credibility"); United States v. Morrison, 153 F.3d at 49; United States v. Stratton, 779 F.2d 820, 828 (2d Cir. 1985), cert. denied, 476 U.S. 1162 (1986). The conviction must be upheld if

- 36 -

"any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original). These standards apply whether the evidence being reviewed is direct or circumstantial. See Glasser v. United States, 315 U.S. 60, 80 (1942).

With these principles in mind, we turn to defendants' various sufficiency challenges.

### 1.  DeRoss's Challenge to the Murder Count

Count One charged defendants with murder in aid of racketeering, or aiding and abetting such a murder, in violation of 18 U.S.C. §§ 1959(a)(1) and 2.  Section 2 provides, in pertinent part, that whoever "aids, abets, . . . commands, induces or procures" the commission of a federal offense, or "willfully causes an act to be done which if directly performed by him" would be a federal offense, "is punishable as a principal." 18 U.S.C. § 2(a) and (b).  Section 1959(a) provides, in pertinent part, that

> [w]hoever, . . . for the purpose of . . .
> maintaining or increasing position in an enterprise
> engaged in racketeering activity, murders . . . any
> individual in violation of the laws of any State or
> the United States, or attempts or conspires so to do,
> shall be punished--
>
> (1) for murder, by death or life imprisonment,
> or a fine under this title, or both . . . .

18 U.S.C. § 1959(a)(1).  To convict a defendant of such a murder, the government must prove beyond a reasonable doubt (1) that the

- 37 -

organization was a RICO enterprise, (2) that the enterprise was engaged in racketeering activity as defined in RICO, (3) that the defendant in question had a position in the enterprise, (4) that that defendant committed or aided and abetted the murder, and (5) that his general purpose in so doing was to maintain or increase his position in the enterprise. See generally United States v. Rahman, 189 F.3d 88, 126 (2d Cir.), cert. denied, 528 U.S. 982 (1999); United States v. Concepcion, 983 F.2d 369, 381 (2d Cir. 1992), cert. denied, 510 U.S. 856 (1993). "Liability for aiding and abetting can be established by showing . . . that the defendant 'consciously assisted the commission of the specific crime in some active way.'" United States v. Ogando, 547 F.3d 102, 107 (2d Cir. 2008) (quoting United States v. Medina, 32 F.3d 40, 45 (2d Cir. 1994)).

DeRoss challenges the sufficiency of the evidence only as to the fourth element of the murder-in-aid-of-racketeering count, contending that there was no evidence that he aided, abetted, or committed any voluntary act to bring about the disappearance or murder of Cutolo. (See DeRoss brief on appeal at 42.) This contention is meritless. As set out in detail in Parts I.A., B., and C. above, the evidence against DeRoss included the following:

(1) DeRoss harbored anger at Cutolo resulting from their reversal of positions in the Colombo Family hierarchy, with DeRoss originally having been Cutolo's captain, and Cutolo becoming the family's underboss and superior to DeRoss in 1998;

(2) in mid-April 1999, DeRoss asked Campanella, with seriousness, how Campanella would feel about killing Cutolo;

(3) in mid-May 1999, DeRoss met with Floridia and, with seriousness, told him not to worry about his troubles with Cutolo because "[t]hings are going to change";

(4) on the afternoon of May 26, 1999, Cutolo disappeared;

(5) at 5 a.m. on May 27, barely eight hours after Cutolo could be considered missing, DeRoss arrived at Cutolo's home demanding--in tones implying that he had the right to them--the books and records maintained by Cutolo, who was above him in the Colombo Family hierarchy;

(6) one week after Cutolo's disappearance, DeRoss, with Persico standing right behind him, told DiLeonardo, the Gambino Crime Family captain who was the liaison with the Colombo Family, that Cutolo had been missing for a week and that DiLeonardo would be dealing with Persico and DeRoss instead of Cutolo from then on, thereby informing DiLeonardo in Mafia-speak that Cutolo was dead;

(7) two weeks after Cutolo's disappearance, DeRoss told Campanella that Cutolo was gone because he was "getting too powerful"; that if Persico went back to jail as expected, "Bill would have took over the family" and "would have never gave the family back to Allie Boy"; that, therefore, "Bill had to go";

(8) three weeks after Cutolo's disappearance, having unsuccessfully solicited Campanella's help in killing Cutolo, DeRoss, with Persico beside him, said "Bill is gone" and attempted to buy Campanella's allegiance and silence by canceling Campanella's $300,000 debt;

(9) shortly after Cutolo disappeared, DeRoss became the Colombo Family's new underboss; and

(10) in 2004, when DeRoss and Floridia were incarcerated and spending their days together in the Metropolitan Detention Center, DeRoss admitted his orchestration of Cutolo's murder, saying "he brought Billy into the family. . . . [A]nd he took him out of the family."

In sum, the evidence easily permitted the jury to find that DeRoss attempted to get Campanella to help kill Cutolo; that shortly before Cutolo disappeared, DeRoss reassured Floridia that Cutolo would soon be dead; that DeRoss knew Cutolo was dead on May

- 39 -

26, allowing DeRoss with impunity to invade Cutolo's home at 5 a.m. on May 27 demanding the Colombo Family books and records; that DeRoss told others that Cutolo was dead and said that Persico had needed to have Cutolo killed; and that when DeRoss was in jail with Floridia, DeRoss said he had killed Cutolo. The evidence was ample to permit the jury to find that DeRoss participated in the planning and orchestration of Cutolo's murder.

2. The Witness Tampering Counts

Counts Six and Five charged Persico and DeRoss with witness tampering and conspiracy to commit witness tampering, respectively, in violation of 18 U.S.C. §§ 1512(b)(1) & (b)(2)(A) and 18 U.S.C. § 371, in connection with DeRoss's meeting with Peggy Cutolo, Cardinale, and Cutolo Jr. to dissuade them from testifying to what they really believed had happened to Cutolo. Section 1512, as it read at the time of trial, made it unlawful, in pertinent part, to

> knowingly use[] intimidation or . . . threaten[] . . . another person, or attempt[] to do so, . . . with intent to--
>
> (1) influence . . . or prevent the testimony of any person in an official proceeding; [or]
>
> (2) cause or induce any person to--
>
> (A) withhold testimony . . . from an official proceeding . . . .

18 U.S.C. §§ 1512(b)(1) & (b)(2)(A) (2000). In order to establish a violation of § 1512, the government must prove a "nexus" between

the defendant's conduct and a particular official proceeding. *Arthur Andersen LLP v. United States*, 544 U.S. 696, 707-08 (2005); *see*, *e.g.*, *United States v. Kaplan*, 490 F.3d 110, 125 (2d Cir. 2007) ("persuader must believe that his actions are likely to affect a particular, existing or foreseeable proceeding"); *cf.* *United States v. Aquilar*, 515 U.S. 593, 598-600 (1995) (finding "nexus" element in 18 U.S.C. § 1503, which prohibits, *inter alia*, obstructing or influencing "the due administration of justice," or "endeavor[ing]" to do so, "corruptly or by threats or force"). The "official proceeding" referred to in § 1512 "need not be pending or about to be instituted at the time of the offense," 18 U.S.C. § 1512(e)(1) (2000), and "the testimony . . . need not be admissible in evidence," *id.* § 1512(e)(2) (2000).

Persico and DeRoss contend that there was no evidence that DeRoss exerted pressure on Cutolo family members to lie or that he intended to interfere with any witness's testimony in an official proceeding. Persico also contends that there was insufficient evidence to show that he was involved in any of the conduct attributed to DeRoss. We are unpersuaded.

In October 1999, Persico was arrested for violation of his bail conditions (*see* Tr. 3946, 3949), and it is undisputed that "[a]s early as October of '99" the government "made it clear they were looking at Mr. Persico as a target" of its investigation into Cutolo's disappearance (*id.* at 3684, 3676-77 (testimony and statement of Persico's attorneys)). Thus, it was plainly foreseeable that there would be a grand jury proceeding at which

- 41 -

Peggy Cutolo, Cardinale, and/or Cutolo Jr. might be called to testify. And indeed, it was foreseen, for in March 2000, DeRoss met with the Cutolos for a conversation (which Cutolo Jr. secretly tape-recorded) and told the Cutolos that the government "may be trying to build a case" against Persico (GX 67B at 7). Cardinale understood that they were talking about a future "case against Allie for [her] father's disappearance." (Tr. 327-28.) In that conversation, it was clear that DeRoss was meeting with the Cutolos on behalf of Persico; DeRoss said he had come to tell them that "the other fella would like to send an investigator" to talk to them (GX 67B at 4), and he stated that "the investigator is Allie's investigator" (id. at 6). When Peggy Cutolo expressed her reluctance, and Cutolo Jr. said he did not want his mother to have to reopen the emotional wounds, DeRoss indicated that Persico would not be happy if they refused to talk to the investigator. (See GX 67B at 4 ("if you tell the [investigator] no, people may get bad feelings"); id. at 6 ("I don't know how personally he'll react."); id. at 8 ("I don't want him to get any idea.").) And after having secured a commitment that the Cutolos would speak with Persico's investigator, DeRoss said, "I'll get back to him today. And uh, tell him you'll be too happy to help. That's my words to him." (Id. at 15.) There can be no serious question that the evidence was sufficient to permit the jury to infer that DeRoss was speaking to the Cutolos on orders from Persico.

In his attempts to persuade the Cutolos to speak to Persico's investigator, DeRoss also indicated that the Cutolos

should not speak candidly in any government investigation. For example, when Cardinale envisioned to DeRoss the possibility that her mother might be overcome by emotion and let her "true feelings" come out, DeRoss's response was that there would be no harm if that happened only in the meeting with the investigator: "the investigator is Allie's investigator, she's not the law." (GX 67B at 6 (emphasis added).) Thus, when DeRoss told the Cutolos "Don't show your feelings. What you got in your heart, what you got in your stomach" (GX 67B at 5 (emphasis added)), those instructions were easily understood by the Cutolos to mean that if they "talk[ed] to the police about what [they] actually thought, that could hurt [Allie]" (Tr. 326). In urging them to cooperate with Persico, DeRoss pointed out that he, DeRoss, was "in a position" to prevent Peggy Cutolo from getting "hurt" (GX 67B at 6; see Tr. 326-27)--a statement that plainly implied to the Cutolos that he was also in a position to do precisely the opposite. And in addition to mentioning the possibility of harm to Peggy, DeRoss also pointed to that prospect for Cutolo Jr. (see GX 67B at 5; Tr. 324-25), for Cardinale's husband (see GX 67B at 5-6; Tr. 325-26), and for Cardinale's young daughters (see GX 67B at 5 ("You got little, you got kids here")). "Worry about your family," he said (id. at 8); "You understand what I'm telling you babe? You've been, you've been around this life" (id. at 6).

The Cutolos did understand. Peggy Cutolo testified that she knew that DeRoss was explicitly threatening her and her children and that he was telling her to "[k]eep [her] mouth shut."

(Tr. 632.) And Cardinale testified that she believed that if the Cutolos told anyone "what we really felt, that it would be taken out on my husband or my brother, even my kids." (Id. at 331.)

In sum, the evidence was sufficient for the jury to find that Persico had been informed by the government that he was the target of an investigation into the disappearance of Cutolo; that a grand jury proceeding on that matter was thus foreseeable to Persico and DeRoss; that Persico sent DeRoss to visit the Cutolos; that DeRoss told the Cutolos that the government might be trying to build a case against Persico; that DeRoss told the Cutolos not to tell anyone acting for the government what they really believed had happened to Cutolo; and that DeRoss threatened harm to Peggy Cutolo, Cutolo Jr., Cardinale, Cardinale's husband, and their young daughters if the Cutolos spoke candidly to anyone conducting an official investigation. While DeRoss did from time to time utter the words "[t]ell the truth" (e.g., GX 67B at 11), his other recorded statements and the testimony of Peggy Cutolo and Cardinale provided sufficient evidence for the jury to conclude that the Cutolos reasonably understood DeRoss to mean that, insofar as any government inquiry was concerned, they should not tell the truth.

C. The New-Trial Motions Based on the Discovery of Cutolo's Body

Persico and DeRoss pursue their contention that they are entitled to a new trial based on the government's posttrial discovery of Cutolo's buried body, and its new information that

- 44 -

DeMartino, while involved in planning Cutolo's murder, was not the actual shooter. Persico argues that the government's case against him was weak, shored up only by the summation "theory that Vincent 'Chickie' DeMartino had killed Cutolo at Persico's behest and dumped Cutolo's body in the ocean." (Persico brief on appeal at 24; see id. at 25-26.) DeRoss argues that "[h]ad the jury been informed that DeMartino was not the shooter and that the evidence demonstrated the involvement of three other individuals from another Colombo crew, the jury would have certainly acquitted DeRoss because the government's entire theory was that DeRoss carried out the order by directing DeMartino to murder Cutolo." (DeRoss brief on appeal at 38.) We reject all of defendants' contentions.

The Federal Rules of Criminal Procedure allow the district court, upon the defendant's motion, to "grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). Our standard for the grant of such a motion requires that

> (1) the evidence be newly discovered after trial; (2) facts are alleged from which the court can infer due diligence on the part of the movant to obtain the evidence; (3) the evidence is material; (4) the evidence is not merely cumulative or impeaching; and (5) the evidence would likely result in an acquittal.

United States v. Owen, 500 F.3d 83, 87-88 (2d Cir. 2007) ("Owen"), cert. denied, 552 U.S. 1237 (2008). "The 'ultimate test' is 'whether letting a guilty verdict stand would be a manifest injustice . . . . There must be a real concern that an innocent person may have been convicted.'" United States v. Canova, 412

- 45 -

F.3d 331, 349 (2d Cir. 2005) (quoting United States v. Ferguson, 246 F.3d 129, 134 (2d Cir. 2001)).

"The motion is not favored," United States v. Gilbert, 668 F.2d 94, 96 (2d Cir. 1981), cert. denied, 456 U.S. 946 (1982), and the denial of such a motion will not be reversed except for abuse of discretion, see, e.g., United States v. Mayo, 14 F.3d 128, 132 (2d Cir. 1994); United States v. Siddiqi, 959 F.2d 1167, 1173 (2d Cir. 1992); United States v. Parker, 903 F.2d 91, 103 (2d Cir.), cert. denied, 498 U.S. 872 (1990).

The district court denied defendants' discovery-of-the-body new-trial motions principally on the ground that they failed to establish the third and fifth requirements of the Owen standard, i.e., that the new evidence be material and that it be likely to result in an acquittal. The court noted that the government had not contended that either Persico or DeRoss actually pulled the trigger or that either was even present at Cutolo's murder, and it saw no contradiction between the government's theory of the murder, i.e., that Persico and DeRoss ordered and arranged for others to execute Cutolo, and the discovery of Cutolo's body, which the coroner had determined evidenced a homicide. See District Court 2008 Order at 25. As the court stated in denying defendants' motions for reconsideration, "the shooter's identity and the burial site location are relevant, but neither are exculpatory, nor do they serve to impeach the credibility of any of the government's key witnesses." Memorandum and Order dated February 17, 2009, at 6.

- 46 -

We agree. Although Persico and DeRoss argue that the discovery of Cutolo's body undercut the government's "entire theory" at trial (e.g., DeRoss brief on appeal at 38), that discovery in fact undercut only the theory advanced in summations as to how Cutolo's dead body had been concealed. Nothing about the discovery of the body undercuts the government's contention that the murder was ordered and arranged by Persico and DeRoss.

Persico, although not challenging the legal sufficiency of the evidence to support the jury's verdict against him on the murder count, contends that the discovery of Cutolo's body warranted the granting of his motion for a new trial because the government's case against him was unpersuasive without the suggestion that he had called the marina to arrange for Cutolo's burial at sea. Persico argues that the case against him was "stitched together" and "quite thin," "prov[ing] little more than that he may have learned that Cutolo was dead and apparently was not saddened by the news." (Persico brief on appeal at 20-21.) Persico's characterizations do not do justice to the record. As described in Parts I.A., B., and C. above, the record included evidence that:

> (1) in the Colombo Family war centering on whether the new boss would be Orena or Persico, in which a dozen people were killed, Cutolo had supported Orena;

> (2) Persico was aware in 1999 that Cutolo himself wanted to become the family's boss--and might try to kill Persico to achieve that goal--giving Persico motive to kill Cutolo;

> (3) Persico needed to have Cutolo killed because Persico was about to go to jail on the gun charge and Cutolo

- 47 -

had gotten so powerful that he would have taken, and refused to yield, control of the family;

(4) Cutolo expected to meet Persico on May 26 at 92nd and Shore, but Persico never showed up;

(5) Cutolo disappeared from 92nd and Shore on May 26 and was killed;

(6) after May 26, Persico never tried to reach Cutolo again;

(7) an underboss cannot be killed without permission from the family's boss;

(8) after underboss Cutolo's disappearance, Persico launched no investigation in search of an explanation;

(9) Persico was present for and silently endorsed DeRoss's statements to DiLeonardo and Campanella shortly after May 26 indicating that Cutolo had been killed; and

(10) Persico himself told the boss and underboss of the Bonanno Crime Family that Cutolo was gone because he had tried to "take what[ wa]s not his," i.e., control of the Colombo Crime Family.

In sum, there was solid evidence, taken as a whole, that Persico had a strong motive to have Cutolo killed; that Persico made or endorsed statements telling important members of other crime families that Cutolo had been killed; and that Persico lured Cutolo to a secluded location from which he could be kidnaped to be killed. In light of this evidence and the evidence against DeRoss discussed in Part II.B.1. above, we see no likelihood that innocent men have been convicted, no injustice in the guilty verdicts, and no error or abuse of discretion in the district court's conclusion that the discovery of Cutolo's body did not warrant the granting of a new trial.

D.  Other Arguments in Support of a New Trial

In support of their arguments for a new trial, Persico and DeRoss advance other contentions that do not require extended discussion.  Principally, they contend that the government violated its Brady obligations, and that they were denied the right to compulsory process by the high cost of producing a witness they wished to have testify for the defense.

1.  The Alleged Brady Violation

At trial, Cardinale testified on cross-examination that after her father's disappearance, her mother found "[a] little over a million dollars" hidden in the vents of their home and that that money was not turned over to the government.  (Tr. 410.) Peggy Cutolo testified that she had found $1.65 million, that she had disclosed that fact to the government, and that the government had not required her to forfeit the money or to pay taxes on it. (See id. at 624, 696-98.)  Defendants contend that the government violated its Brady obligation to disclose this impeachment evidence because it made no "formal disclosure" of these facts until after trial.  (Persico brief on appeal at 44.)  They contend that without a formal disclosure, they "had every reason to believe that [Peggy's] testimony was false"--and that the corroborative testimony of an FBI agent was also false (id.)--and hence they were deprived of the opportunity to argue to the jury that the government's allowing Peggy to keep $1.65 million made all of her testimony unworthy of belief.

It is well established that the government has an obligation under the Due Process Clause to disclose to the defendant evidence that is material. See, e.g., Brady, 373 U.S. at 87. Evidence is material, however, only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Strickler v. Greene, 527 U.S. 263, 280 (1999) (internal quotation marks omitted); Kyles v. Whitley, 514 U.S. 419, 433 (1995) (internal quotation marks omitted).

These principles apply both to information going to the heart of the defendant's guilt or innocence and to information that might well alter the jury's evaluation of the credibility of a significant prosecution witness. See, e.g., Giglio, 405 U.S. at 154; Napue v. Illinois, 360 U.S. 264, 269 (1959). However, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or is subject to extensive attack by reason of other evidence, the undisclosed evidence may properly be viewed as cumulative, and hence not material, and not worthy of a new trial. See, e.g., United States v. Avellino, 136 F.3d 249, 257, reh'g denied, 136 F.3d 262 (2d Cir. 1998); United States v. Helmsley, 985 F.2d 1202, 1210 (2d Cir. 1993); United States v. Petrillo, 821 F.2d 85, 90 (2d Cir. 1987).

In sum, undisclosed impeachment evidence is not material in the Brady sense when, although "possibly useful to the

defense," it is "not likely to have changed the verdict." Giglio, 405 U.S. at 154 (internal quotation marks omitted).

The district court, in rejecting defendants' posttrial motions for a new trial on the ground of the alleged Brady violation, found, inter alia, that, for several reasons, the timing of the disclosure did not cause defendants any prejudice. The court noted that the facts were disclosed on the fourth day of a trial that continued for some six or seven weeks thereafter, and it concluded that "the Defendants had more than ample time to assimilate the evidence and to effectively use it at trial." District Court 2008 Order at 40. We agree.

Cardinale was the second of the government's 31 trial witnesses (the first being the mechanic who left Cutolo at 92nd and Shore on May 26); Cardinale's revelations as to the large sum of money found and retained came during her cross-examination by the defense. The third witness at trial was Peggy Cutolo, who had actually found and been allowed to keep the money. The government brought out during its direct examination of Peggy that she had found $1.65 million, that she had disclosed that fact to the government, and that she had been allowed to keep the money. (See Tr. 624.) Thus, the government affirmatively elicited from Peggy the information that defendants wish they had used in arguments attacking her credibility. As the district court noted, the relevant testimony was given early in the trial. After that point, it cannot be said that the Brady material was undisclosed; and the defense had another six weeks to use it. Defendants'

complaint that there was no "formal disclosure" until after the trial provides no basis for a new trial.

Later in the trial, FBI Special Agent Gary J. Pontecorvo was called as a witness for the defense; he testified that the Cutolos had advised him in early 2001 that they were in possession of some $1.6 million in cash, which Pontecorvo assumed had been amassed from Cutolo's illegal activities. (See id. at 5292-94.) Pontecorvo testified that, after being so advised, he promptly informed the United States Attorney's Office ("USAO"); thereafter Peggy Cutolo or her attorney dealt directly with the USAO with regard to those funds, to determine whether some or all had to be forfeited or whether she would have to pay taxes on it (see id. at 5294-96). Although defendants argue here that "[t]hroughout the trial, the defense labored under the misimpression that Mrs. Cutolo and Agent Pontecorvo were testifying falsely" (Persico brief on appeal at 45), they made that assumption at their peril. Nothing in the Constitution gives defendants the right to assume that the government has deliberately elicited or countenanced false testimony and then to seek a new trial on the basis that they did not know the testimony was true.

The district court also concluded that the evidence that Peggy Cutolo was allowed to keep the $1.65 million was "immaterial," given that defendants possessed--and used--other grounds to attack her credibility. Those grounds included Peggy's manifest antipathy toward Persico and DeRoss because she believed they had ordered her husband's death, and her internally

inconsistent testimony as to precisely where she found the money. Indeed, while Persico argues that belated disclosure of the information that Peggy found and was allowed to keep $1.65 million "significantly impaired defense counsel's ability to impeach the credibility of the key prosecution witness" (Persico brief on appeal at 48), he also acknowledges that even without impeachment on the basis of the retained money, "Mrs. Cutolo was anything but a credible witness.  As the trial court noted, her testimony varied 'from one day to the next . . . on very critical things'" (id. at 23 (quoting Tr. 5488)).

The district court further noted that "the testimony of Peggy Cutolo and Cardinale was only a small portion of the evidence that led to Defendants' convictions," and it concluded that the evidence as to the money Peggy found and was allowed to keep "most certainly would not have damaged the credibility of the virtual parade of other witnesses that testified against the Defendants, nor invalidated the circumstantial evidence on which the jury most certainly relied."  District Court 2008 Order at 40-41.  The court concluded that "there was virtually no probability that disclosure of this information at an earlier time would have changed the outcome of this case."  Id. at 40.

Our review of the record persuades us that the conclusions of the district court were correct and that defendants' contentions that they should be granted a new trial on account of the alleged Brady violation were properly rejected.

## 2. Persico's Request for the Production of Massino

After Vitale testified that Persico told him and Massino, in discussing Cutolo in the latter part of 1999, that "a person can't take what's not his" (Tr. 2866), thereby informing them that Cutolo had been killed because of his desire to usurp Persico's position as boss of the Colombo Family, Persico informed the government that he wished to call Massino as a witness. Massino was then in the Witness Security Program, and Persico was informed that the cost of transporting Massino--which Persico was expected to pay--would be some $40,000 (see Persico brief on appeal at 48). In light of the expense, Persico's counsel suggested that she be allowed to question Massino by video conferencing, a suggestion that the government rejected for reasons of security; after objecting that the expense was prohibitive, Persico decided not to call Massino. (See Tr. 3739, 3915-16, 4281.) On appeal, Persico, joined by DeRoss, contends that the requirement that Persico pay "an exorbitant price to bring a witness to court (a price he declined to pay) unduly burdened his compulsory process rights." (Persico brief on appeal at 48.) Given the present record, we disagree.

A defendant in a criminal trial has a Sixth Amendment "right . . . to have compulsory process for obtaining witnesses in his favor." U.S. Const. amend VI. To establish a violation of that right, the "defendant must demonstrate that he was deprived of the opportunity to present a witness who would have provided testimony that was 'both material and favorable to his defense.'"

Howard v. Walker, 406 F.3d 114, 132 (2d Cir. 2005) (quoting United States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982)). To meet this standard, the defendant need not "render a detailed description of [the] lost testimony," Valenzuela-Bernal, 458 U.S. at 873; but he must make a "plausible showing" that the testimony would have been material and favorable, id. "In addition, he must show that 'there is a reasonable likelihood that the testimony could have affected the judgment of the trier of fact.'" United States v. Ginsberg, 758 F.2d 823, 831 (2d Cir. 1985) (quoting Valenzuela-Bernal, 458 U.S. at 874).

Generally, "financially able criminal defendants must bear the cost of bringing their own witnesses to the trial." United States v. Garmany, 762 F.2d 929, 934 (11th Cir. 1985), cert. denied, 474 U.S. 1062 (1986). However, a defendant can have the government bear the cost if he persuades the court that he is unable to pay and shows "the necessity of the witness's presence for an adequate defense." Fed. R. Crim. P. 17(b).

Nothing in the present case supports the contention that these defendants were deprived of the right to compulsory process. First, the reason the cost of having Massino brought to the trial was so high was that Persico waited until late in the trial to inform the government that he wanted to call Massino as a witness. Defendants had been notified in mid-October 2007--weeks before the trial began--that Vitale would be called as a government witness and would "testify to a conversation in which 'Persico advised [him] that Persico had killed Cutolo because Cutolo had attempted

- 55 -

to take over the crime family from Persico'" (Persico brief on appeal at 48-49 (quoting a government memorandum to the district court dated October 19, 2007)).  The government, by letter dated October 17, 2007, had asked that Persico inform the government "by October 26, 2007" of "any cooperating witnesses the defense may call," pointing out that "the United States Marshal Service requires significant advance notice for production of such witnesses."  Persico did not inform the government of his desire to call Massino until more than six weeks later, on November 30.  The district court noted that the high cost of bringing Massino to the trial involved first-class air travel for Massino and four or five marshals "because there was no advance notice."  (Tr. 3916.)

Second, at no point has Persico suggested that he lacked the ability to pay the cost of bringing Massino to the trial.  Had Persico been unable to pay, he could have applied to the district court for relief under Rule 17(b); he did not.

Finally, Persico has not made any showing that Massino's testimony would have been material or favorable to his defense.  He supposes that because the government itself did not call Massino to testify, Massino likely did not recall the Persico conversation, described by Vitale, indicating that Persico had had Cutolo killed; and he argues that Massino's testimony that he had no such recollection "would have gone far to demonstrate that no such conversation had occurred" (Persico brief on appeal at 54).  This argument piles speculation upon supposition and falls far short of providing a basis for a new trial.

CONCLUSION

We have considered all of defendants' arguments on these appeals--including their contentions that testimony by some witnesses was incredible as a matter of law--and have found them to be without merit. The judgments of the district court are affirmed.